1  Alisa Rose Adams (Cal Bar #277697)
2  The DannLaw Firm
3  26100 Towne Center Drive
   Foothill Ranch, CA 92610-3442
4  Telephone: (949) 200-8755
   Facsimile: (866) 843-8308
5  notices@dannlaw.com
6  aadams@dannlaw.com

7  Additional counsel listed on signature page
8
9  Attorneys for Plaintiff and the Putative Classes

10
11                     **UNITED STATES DISTRICT COURT**
12                   **NORTHERN DISTRICT OF CALIFORNIA**
13

14  SAMUEL BELOFF, individually and on            Case No.
    behalf of all others similarly situated,
15                                                **CLASS ACTION COMPLAINT FOR:**
16                          Plaintiff(s),             1.  Breach of Contract;
    v.
17                                                   2.  Intentional Infliction of Emotional
                                                         Distress;
18  WELLS FARGO BANK, N.A.,
                                                     3.  Negligence
19                          Defendant(s).          **DEMAND FOR JURY TRIAL**
20

21
22          Plaintiff Samuel Beloff individually and on behalf of all others similarly situated,
23  ("Plaintiff") brings this Class Action Complaint for Damages against Defendant Wells Fargo
24  Bank, N.A. ("Defendant"). Plaintiff makes these allegations based on personal information as to
25  those allegations pertaining to himself and his personal circumstances and upon information and
26  belief based upon the investigation of Counsel and facts that are matters publicly known, on all
27  other matters and states as follows:
28

*CLASS ACTION COMPLAINT*
1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **NATURE OF THE ACTION**

1.      The benefits of homeownership have long been the cornerstone of the American Dream, allowing people, regardless of economic status, to accumulate wealth by gaining access to credit, building equity, and reducing housing costs.[1]

2.      This case seeks recourse for the hundreds, if not thousands or tens of thousands, of borrowers who suffered damages as a result of Defendant's "calculation errors," which stemmed from a common cause, and resulted in Defendant wrongfully denying permanent loan modifications for borrowers.

3.      Defendant is one of the largest financial institutions in America and one of the nation's largest residential home mortgage servicers. Among other things, Defendant provides mortgage loan modification services to consumers who have defaulted on their mortgage.

4.      Defendant uses mortgage loan modification tools to create automated calculations and to determine whether consumers in default are eligible for loan modifications under Government Sponsored Enterprise ("GSE") and other federal agency requirements.

5.      Between 2010 and 2018, Defendant failed to detect or ignored multiple systematic errors in its automated decision-making software. This software determined customers' eligibility for a government-mandated mortgage modification during a time of extreme financial distress. Its importance to these customers' lives cannot be overstated. Yet, Defendant failed to adequately test, audit, and verify that its software was correctly calculating whether customers met threshold

---

[1]https://www.forbes.com/sites/forbesrealestatecouncil/2021/09/28/homeownership-and-the-american-dream/?sh=15efd6d23b55 (last visited Feb. 16, 2024)

requirements for a mortgage modification. Defendant further failed to regularly and properly audit the software for compliance with government requirements—allowing life-changing errors to remain uncorrected for years.

6.    As a result of Defendant's deficient auditing and compliance procedures, Defendant repeatedly violated the Home Affordable Modification Program ("HAMP") and other government statutes, regulations, and enforcement orders over a period of at least eight years. By this conduct, Defendant denied Plaintiff and other Class members mortgage modifications that Defendant was legally required to offer.

7.    To make matters worse, even after discovering the 2013 error, Defendant continued using the faulty mortgage modification software to assess borrowers' eligibility for modification options for more than two years. Defendant did not implement new controls until October 2015. And it did not disclose the error to federal regulators or the public until August 2018.

8.    Moreover, despite discovering the error in 2013 and allegedly implementing new controls in 2015, Defendant still did not reform its auditing and verification practices. Related errors that would affect hundreds of additional borrowers were not discovered, remedied, or disclosed until 2018 or later.

9.    Defendant's failure to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that Defendant and its parent company intentionally abandoned their oversight responsibilities—and did so to a shocking degree. And, until they were caught red handed, they concealed those failures.

10.    Defendant's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced through a formal Cease and Desist Letter that it would

prohibit Defendant's parent company from expanding its business until it sufficiently improved its governance and controls.

11.     Finally, during his testimony on March 12, 2019 in the United States House of Representatives Financial Services Committee, former Wells Fargo CEO Timothy Sloan admitted the fundamental allegations of this Complaint: that due to the Bank's actions or inactions, hundreds (later revealed to be thousands), of customers were improperly denied a loan modification between 2010 and 2015, and that over 500 of those had lost their homes to foreclosure. And he also admitted that Wells Fargo did not disclose to those victims that they had been injured through no fault of their own until late 2018.

12.     These disclosed errors led to the filing of two putative class action Complaints against Wells Fargo that resulted in Final Approval of Class Settlement: *Alicia Hernandez, et al. v. Wells Fargo Company, et al.*, N.D. Cal. Case No. 3:18-cv-07354-WHA (the "Hernandez case") and *Ethan Ryder, et al. v. Wells Fargo Bank, N.A.*, S.D. Ohio Case No. 1:19-cv-00638-TSB (the "Ryder case"), and a Consumer Financial Protection Bureau ("CFPB") Consent Order in December 2022.

13.     The Plaintiff has been identified as putative class members in either the Hernandez case or the Ryder case.  Plaintiff does not reasonably believe that the modification errors committed by Wells Fargo in their loans or the loans of the putative class members in this action are the same errors identified in either the Hernandez case or the Ryder case.

## **PARTIES**

14.     <u>Representative Plaintiff Samuel Beloff.</u>  SAMUEL BELOFF is a natural person and citizen of Ohio residing in Clark County, Ohio.  Plaintiff Samuel Beloff owned certain real property located at 624 Riverwood Drive, Dayton, OH 43430 (the "Beloff Property") from July

15, 1998 until on or about June 9, 2016, when due to the admittedly erroneous actions of Wells Fargo, he transferred the property via a deed-in-lieu of foreclosure.

15.     Defendant Wells Fargo Bank, N.A. WELLS FARGO BANK, NATIONAL ASSOCIATION is a federally-chartered National Banking Association that is organized and exists under the National Banking Act, with its principal place of business located in Sioux Falls, South Dakota ("Defendant"). Defendant is subject to the supervision of the Comptroller of the Currency of the United States Department of the Treasury and is deemed a citizen of South Dakota pursuant to 28 U.S.C. § 1348.  Wells Fargo Bank, N.A. provides Wells Fargo & Company personal and commercial banking services and is Wells Fargo & Company's wholly-owned, principal operating subsidiary. Wells Fargo & Company is incorporated in Delaware with its principal place of business and corporate headquarters in San Francisco, California

**JURISDICTION AND VENUE**

16.     Jurisdiction is proper in this Court under 28 U.S.C. §1332 (diversity jurisdiction). Specifically, this Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed Class, and at least one Class member is a citizen of a state different from Defendant.

17.     Supplemental jurisdiction to adjudicate issues pertaining to state law is proper in this Court under 28 U.S.C. §1367.

18.     Defendant routinely conducts business in the State where this district is located, has sufficient minimum contacts in this State and has intentionally availed itself of this jurisdiction by marketing and selling products and services, and by accepting and processing payments for those products and services within this State.

*CLASS ACTION COMPLAINT*

19.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to the claims of the Plaintiff occurred within this District, and Defendant does business in this Judicial District.

## INTRADISTRICT ASSIGNMENT

20.     Pursuant to Civil L.R. 3-2(c), this case is properly assigned to the San Francisco or Oakland Division because a substantial part of the events or omissions that give rise to Plaintiff's and Class members' claims occurred in San Francisco County.

## COMMON FACTUAL ALLEGATIONS

21.     Plaintiff, on behalf of themselves and all similarly situated persons, seeks to recover statutory damages, punitive damages, and actual damages resulting from Defendant's wrongful conduct in connection with Plaintiff's and Class members' residential mortgage loans.

**A.     Defendant services residential mortgage loans nationwide.**

22.     Defendant is one of the nation's largest providers of residential home mortgage loans. It services, and at all times relevant hereto has serviced, residential home mortgage loans nationwide.

23.     Defendant is a loan servicer and lender. It derives income in a number of ways including (a) payments based on a percentage of each borrower's principal balance pool, (b) float interest, (c) late fees, (d) foreclosure fees, (e) property inspection and preservation fees, and (f) broker opinion fees.

24.     Defendant is a wholly-owned and controlled subsidiary of Wells Fargo & Company (NYSE: WFC), one of the nation's largest financial institutions. Wells Fargo & Company is a Delaware corporation headquartered in San Francisco, California and a registered bank holding company.

25.     Wells Fargo & Company describes itself as a "diversified, community-based financial services company with $1.87 trillion in assets." *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (Nov. 6, 2018). It provides "banking, investment, and mortgage products and services as well as consumer and commercial finance, through 8,050 locations, 13,000 ATMs, digital (online, mobile, and social), and contact centers (phone, email, and correspondence)." *Id.* Wells Fargo & Company employs approximately 262,000 full-time employees in 37 countries and serves "one in three households in the United States." *Id.*

**B.     Defendant employs uniform, nationwide loan servicing, loan modification, and foreclosure practices.**

26.     Defendant utilizes uniform and standardized loan servicing, loan modification, and foreclosure practices nationwide. Much of Defendant's uniform and standardized loan servicing, loan modification, and foreclosure practices are reliant upon automated processes, systems, and tools.

27.     Defendant's loan servicing, loan modification, and foreclosure practices are governed by federal requirements and obligations.

28.     The Federal Housing Administration ("FHA") is an agency within the United States Department of Housing and Urban Development ("HUD") that supplies mortgage insurance to FHA-approved lenders, insuring loans on single-family homes.

29.     Mortgage insurance protects lenders from the risk of borrower defaults because the FHA agrees to pay lenders in the event of borrower default.

30.     Lenders must be pre-approved to qualify for FHA mortgage insurance. They must also comply with HUD regulations.

31.    Defendant is a pre-approved lender that qualifies for FHA mortgage insurance. Defendant is therefore required to comply with HUD regulations.

32.    For loans that are protected by FHA mortgage insurance, Defendant and the borrower(s) executed loan documents that incorporate by reference HUD regulations.

33.    In 2008, the federal government began the Troubled Asset Relief Program (TARP). Pursuant to TARP, all servicers that receive funding from TARP must participate in HAMP.

34.    Defendant received about $25 billion in TARP funds. In return, Defendant agreed to participate in HAMP and be obligated by all Program Documentation (defined below).

35.    In 2009, the Secretary of the Treasury implemented the FHA HAMP, which was designed to minimize foreclosures by incentivizing loan modifications. Pursuant to HAMP, HUD has promulgated HAMP guidelines, regulations, and directives.

36.    Defendant is required to comply with all Program Documentation, HAMP, and other Department of Treasury directives.

37.    Among other things, Defendant is required to review defaulted loans for modification eligibility prior to proceeding with any foreclosure. Defendant is required to offer to all defaulted borrowers modifications for which they are eligible prior to conducting any foreclosure. HAMP guidelines require that Defendant undertake a number of specific and non-discretionary steps to determine a consumer's eligibility for modification or other relief. If, after completing a formula-driven net present value analysis, the modified loan would be more profitable than the non-modified loan, HAMP guidelines require that Defendant offer a trial period plan modification. If the borrower completes the trial period plan, Defendant is required to permanently modify the loan.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

38.     To request a modification, the GSE ("government sponsored enterprise," such as Fannie Mae and Freddie Mac) Published Guidelines and FHA regulations require each borrower to submit standardized form assistance applications, financial worksheets, hardship affidavits, and acknowledgment and agreements (the "Modification Contract"). Pursuant to the standard form Modification Contract, the borrower makes a legal representation as to the material truth of all information provided. The borrower agrees to provide all requested financial and hardship information. Among other things, the borrower also promises to undergo credit counseling if they are so requested. In return, Defendant agrees in the Modification Contract to examine the borrower's eligibility for all available modifications. If the borrower is eligible for any available mandatory modifications, Defendant is required by the Modification Contract (as well as HAMP, other Department of Treasury directives, FHA regulations and binding GSE guidelines) to extend a trial period plan.[2]

39.     These standardized Modification Contracts incorporate all applicable obligations in the HAMP provisions, regulations, directives, guidelines, procedures, documentation, instructions, bulletins, frequently asked questions, letters, directives, and other communications issued by the Department of Treasury, GSEs, and federal agencies (collectively, "Program Documentation.").

40.     In all relevant communications with borrowers, Defendant represents that it will extend trial period plans to any borrower who is eligible for a mandatory modification under GSE guidelines and the HAMP.

---

[2] In some circumstances, the Fannie Mae, Freddie Mac and FHA regulations and guidelines require lenders like Wells Fargo to evaluate borrowers who do not submit applications using the same criteria as for the underwritten applications, except for the consideration of the borrower's income. Some of these "Streamlined" modifications may also have been impacted by the software errors.

41.     Defendant receives incentive payments for every successful modification under the Program Documentation. However, Defendant also benefits from unsuccessful modifications, along with foreclosures. If a federally mandated modification is not required, Defendant can offer modification and temporary payment plans outside of HAMP, often under terms that are less favorable to the borrower than federally-mandated plans. Furthermore, Defendant can continue to obtain foreclosure, late fees, property inspection, preservation, and broker opinion fees. What is more, Defendant receives higher float interest payments for non-modification options such as a short sale or a foreclosure. It further receives higher principal balance pool payments if it does not reduce the principal balance pursuant to Program Documentation requirements.

**C.     Defendant repeatedly fails to oversee, test, and audit its uniform loan servicing, mortgage modification, and foreclosure practices.**

42.     In 2010, the Office of Comptroller of the Currency ("OCC") discovered multiple deficiencies and unsafe and unsound practices in Defendant's residential mortgage servicing, modification, and foreclosure programs. The OCC determined that Defendant failed to oversee, audit, and test its foreclosure and modification action tools and practices and failed to comply with applicable laws, prioritizing profits over compliance and causing substantial harm to consumers.

43.     The OCC's investigation and related investigations resulted in millions of dollars in fines assessed by the Federal Reserve to Wells Fargo & Company.

44.     As a result, Defendant agreed to two consent orders with the OCC, committing to taking all necessary and appropriate steps to remedy the deficiencies and unsafe and unsound practices identified by the OCC. In the consent orders, Defendant agreed to form compliance committees and programs subject to the oversight of the OCC. It agreed to adopt processes to better oversee, audit, and conduct ongoing testing of its loan servicing, modification, and foreclosure tools and practices and ensure legal and regulatory compliance. Some such agreed

processes were targeted at better oversight, auditing, and testing of automated tools, modification and foreclosure review, and fee assessments.

45.    But Defendant failed to remedy the deficiencies and unsafe and unsound practices identified by the OCC. It failed to adopt adequate oversight, auditing, and testing processes and programs. And it failed to detect and/or correct repeated and systemwide servicing, modification, and foreclosure process errors.

46.    In 2015, the OCC again determined that, despite the 2011 consent cease and desist orders, Defendant continued to fail to adequately oversee, audit, and test its servicing, modification, and foreclosure practices for compliance. As a result, the OCC assessed millions of dollars in monetary penalties against Defendant's parent company, Wells Fargo & Company.

47.    In early 2018, the OCC discovered additional and ongoing compliance and conduct failures in Defendant's loan servicing, modification, and foreclosure programs and processes. The OCC determined that Defendant's deficiencies and compliance failures constituted reckless and unsafe or unsound practices in violation of federal law and that Defendant failed to implement and maintain an adequate compliance risk management program. It found that Defendant failed to implement adequate oversight, control, auditing, and testing of its servicing, modification, and foreclosure programs and practices. The OCC also found that Defendant failed to adequately report compliance concerns, compliance failures, and Defendant's efforts to remedy them.

48.    As a result, Wells Fargo & Company and the Defendant entered into a consent cease and desist order with the OCC, again agreeing to adopt system-wide compliance programs and oversight.

49.    The Federal Reserve also issued a consent cease and desist order in early 2018 restricting Defendant's growth until governance, oversight, risk management, auditing, and testing

is improved. In its consent cease and desist order, the Federal Reserve reports that it determined Defendant "pursued a business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management framework commensurate with the size and complexity of the Firm, which resulted in weak compliance practices."

50.     As a result of the OCC's continued investigations and resulting consent orders, Defendant was and is on notice of serious errors, deficiencies, and unsafe and unsound practices in its loan servicing, modification, and foreclosure processes and practices from 2010 through the present. Defendant was and is likewise aware of the need for oversight, testing and auditing of those processes and practices, including the need for oversight, testing, and auditing of automated tools. Yet Defendant has habitually failed to adopt adequate oversight, testing, and auditing.

### D.    Defendant's automated calculation errors.

51.     Defendant's deficiencies, unsafe and unsound practices, and failure to conduct adequate oversight, auditing, and testing, resulted in a number of systemic automated calculation errors that greatly affected borrowers.

52.      From 2010 through 2019, Defendant utilized automated mortgage loan modification underwriting tools to determine which default borrowers are qualified for a mortgage loan modification or repayment plan.

53.     By its own admissions, Defendant repeatedly failed to test and audit its automated mortgage loan modification underwriting tool, despite the OCC investigations and consent decrees putting it on notice of significant issues with its mortgage practices. Defendant likewise failed to adequately verify that its automated mortgage loan modification tools and standard foreclosure practices complied with consent decree requirements, regulations, and laws.

54.    As a result, Defendant wrongfully failed to approve hundreds of borrowers for appropriate mortgage loan modifications and/or repayment plans.

**E.    Defendant's "first" automated calculation error.**

55.    As a result of its continuing failure to implement adequate oversight, auditing, and test controls, Defendant failed to timely identify a number of automated calculation errors in its mortgage software.

56.    As reported by the OCC, between March 2013 and October 2014, an unidentified error caused Defendant to fail to offer modifications to at least 184 borrowers who were entitled to modification trial period plans.

**F.    Defendant's "second" automated calculation error.**

57.    Unbeknownst to the OCC, Defendant's "first" automated calculation error was not its only one.

58.    On August 3, 2018, Defendant's parent company Wells Fargo & Company issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (August 3, 2018) ("August Report"). In its report, Wells Fargo & Company revealed for the first time that it identified an automated calculation error that caused it to wrongfully deny loan modifications and resulted in hundreds of foreclosures of residential mortgage loans in default between April 13, 2010 and October 20, 2015:

> An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010 and October 20, 2015, when the error was corrected. **This error in the modification tool caused an automated miscalculation of attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification** pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac) and the U.S. Department of Treasury's Home Affordable

Modification Program (HAMP). Customers were not actually charged the incorrect attorneys' fees. **As a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not offered a modification in cases where they would have otherwise qualified. In approximately 400 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification, a foreclosure was completed.**

(Emphasis added).

59.     Defendant's August Report demonstrates that Defendant's loan modification underwriting tool utilized an automated calculation error for more than five years before it was corrected.

60.     During those five years, Defendant wrongfully reported inaccurate information to credit reporting agencies regarding the residential mortgage loans of consumers affected by its calculation error. Namely, Defendant reported to credit reporting agencies that borrowers were in default on their residential home loans, when, in reality, they were wrongfully prohibited from modifying their mortgage payments.

61.     During those five years, Defendant also wrongfully foreclosed on the homes of many of the consumers affected by its calculation error—consumers who should have been offered loan modifications instead of facing foreclosure.

62.     Also, during those five years, on information and belief, Defendant issued periodic statements and notices in connection with consumers' residential home mortgage loans that contained inaccurate information as a result of the automated calculation error.

63.     Moreover, subsequent legal disclosures reveal that Defendant identified its "second" accounting error in August 2013. Defendant's employees discovered the error and escalated the problem to senior management.

64.    It was not until October 2, 2015 that Defendant implemented new controls purporting to address the accounting error and also replaced its system with the LPS/Black Knight Desktop Application. But Defendant did not disclose this accounting error to government regulators, the public, or affected borrowers until almost three years later, on August 3, 2018 (the "August Report"). Despite detecting this error, Defendant concealed it from the public and the OCC, likely in an attempt to avoid additional fines and further OCC supervision.

65.    Even after discovering the calculation error, Defendant continued to conduct foreclosures on the homes of borrowers negatively affected by its "second" calculation error.

66.    Even after discovering the calculation error, Defendant continued to issue inaccurate periodic statements and notices to affected borrowers.

67.    In its August Report, Defendant committed to dedicating $8 million towards remediating customers who were affected by Defendant's "calculation error."

68.    In or around September 2018, Defendant sent form letters to consumers affected by its "calculation error." In those letters, Defendant informed each consumer that, "[W]hen you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation and we're sorry. If it had been correct, you would have been approved for a trial modification."

69.    Although Defendant's letters state that it "*now* realize[s]" (emphasis added) it has made an error causing it to wrongfully fail to approve the consumer's modification, Defendant's August Report demonstrates that it has known about the error since August 2013.

70.    In short, Defendant's apology letters admit that (a) its accounting error caused consumers to be wrongfully denied a loan modification, (b) its accounting error caused consumers harm, (c) its accounting error resulted in inaccurate negative reporting to consumer reporting

agencies that should be corrected, and (d) Defendant had done nothing before September 2018 to remediate consumers and correct inaccurate credit reporting.

**G.     Defendant's "third" automated error.**

71.     Despite being on notice of its automated calculation errors discovered in 2013 and 2014, Defendant still failed to implement adequate oversight, auditing, and testing compliance controls. That failure resulted in additional automated errors causing Defendant to wrongfully refuse to provide modifications on hundreds of additional borrowers' homes.

72.     On November 6, 2018, Defendant's parent company Wells Fargo & Company issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (November 6, 2018) ("November Report"). In its November Report, Wells Fargo & Company disclosed for the first time a third set of related calculation errors affecting an additional 245 consumers, which was identified using a "subsequent expanded review." The November Report also indicates that the first accounting error was actually corrected on October 2, 2015 (as opposed to October 20, 2015 as stated in the August Report):

> An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error regarding foreclosure attorneys' fees affecting certain accounts that were in the foreclosure process between April 3, 2010, and October 2, 2015, when the error was corrected. **A subsequent expanded review identified related errors regarding the maximum allowable foreclosure attorneys' fees permitted for certain accounts that were in the foreclosure process between March 15, 2010, and April 30, 2018, when new controls were implemented. Similar to the initial calculation error, these errors caused an overstatement of the attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises** (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA) and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP). Customers were not actually charged the incorrect attorneys' fees. **As a result of these errors, taken together and subject to final validation, approximately 870 customers were incorrectly denied a loan**

**modification or were not offered a loan modification or repayment plan in cases where they otherwise would have qualified. In approximately 545 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification or repayment plan, a foreclosure was completed.** The Company has contacted a substantial majority of the approximately 870 affected customers to provide remediation and the option also to pursue no-cost mediation with an independent mediator. Attempts to contact the remaining affected customers are ongoing. Also, the Company's review of these matters is ongoing, including a review of its mortgage loan modification tools.

(Emphasis added).

73.    The November Report demonstrates that Defendant's loan modification underwriting tool suffered from the attorneys' fee calculation error for more than eight years.

74.    During those eight years, Defendant wrongfully reported inaccurate information to credit reporting agencies regarding the residential mortgage loans of consumers affected by its calculation error. Namely, Defendant reported to credit reporting agencies that borrowers were in default on their residential home loans, when in reality they were wrongfully prohibited from modifying their mortgage payments. And meanwhile, borrowers faced the consequences, including increased borrowing costs, loss of equity and the appreciation of their home, legal fees, devastating impacts to consumer credit, and incidental costs related to the sudden need to move.

75.    During those eight years, Defendant also wrongfully foreclosed on the homes of consumers affected by its calculation error—consumers who should have been offered loan modifications instead of facing foreclosure.

76.    Also, during those eight years, on information and belief, Defendant issued periodic statements and notices in connection with consumers' residential home mortgage loans that contained inaccurate information as a result of the automated calculation error.

77.    The November Report also admits that Defendant was aware of the accounting error on or before April 30, 2018. But Defendant did not disclose this accounting error to the public or affected borrowers until over six months later, on November 6, 2018.

78.    Despite knowing that its automated errors harmed consumers (and admitting in its Apology Letter that it was appropriate to request consumer reporting agencies remove any negative reporting), Defendant made no effort before November 2018 to rescind the inaccurate and negative information reported to credit reporting agencies regarding consumers affected by the automated errors.

79.    Every additional week and month that a mortgagor spends in the "default zone" with regard to their mortgage materially and negatively affects the mortgagor's credit. Every additional week and month that a mortgagor is stuck in the "default zone" is another week or month where the mortgagor is limited in ability to pay, purchase, buy, earn, rent, or maybe even obtain or continue gainful employment. Every additional week or month in this "default zone" is another week or month accruing damages that are more difficult to recover from each subsequent week or month.

80.    In Exhibit 13 to its 2019 Form 10-K Annual Report, Defendant disclosed that "[t]his effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

**H.    The *Hernandez* and *Ryder* Litigation.**

81.    Before this action was filed, two putative class actions over the prior calculation errors were filed against Wells Fargo which resulted in final approval of class action settlements: *Alicia Hernandez, et al. v. Wells Fargo Company, et al.*, N.D. Cal. Case No. 3:18-cv-07354-WHA

(the "Hernandez case"), and *Ethan Ryder, et al. v. Wells Fargo Bank, N.A.*, S.D. Ohio Case No. 1:19-cv-00638-TSB (the "Ryder case").

82.    In the Order granting Preliminary Approval of the Class Settlement in the Hernandez case, the Court defined the nationwide settlement class as follows:

> All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure.

See *Alicia Hernandez, et al. v. Wells Fargo & Company, et al*, 3:18-cv-07354-WHA, Doc. 277 at pp. 1-2 (N.D. Cal. Apr. 19, 2020).

83.    The Court granted final approval of the settlement in the Hernandez case on October 12, 2020. See *Hernandez*, Doc. 292.

84.    The settlement in the Hernandez case totaled $21,907,778 with over $18.2 million in payments to putative class members. See *Hernandez*, Doc. 344 at pp. 2-3.

85.    In the Order granting Preliminary Approval of the Class Settlement in the Ryder case, the Court defined the nationwide settlement class as follows:

> All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), or the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo because of excessive attorneys' fees being included in the loan modification decisioning process; (iii) whose home Wells Fargo did not sell in foreclosure; and (iv) are reflected in the Settlement Class List as defined herein.

See *Ethan Ryder, et al. v. Wells Fargo Bank, N.A.*, 1:19-cv-00638-TSB, Doc. 50 at p. 3.

86. The Court granted final approval of the settlement in the Ryder case on January 25, 2022. See *Ryder*, Doc. 57.

87. The settlement in the Ryder case totaled $12,000,000 with over $9,098,900 in payments to putative class members. See *Ryder*, Doc. 55 at p. 16.

88. The Plaintiff in this case is not part of the classes who received relief in either the Hernandez case or the Ryder case.

### I.    A Consent Order and a new round of Apology Letters

89. Following the resolutions of the *Hernandez* and *Ryder* matters, Wells Fargo entered into a Consent Order with the CFPB on December 20, 2022 in *In re Wells Fargo Bank, N.A.*, Case No. 2022-CFPB-0011. (the "Consent Order").

90. In the Consent Order, Wells Fargo acknowledged that

   a. "Respondent has incorrectly denied mortgage loan modification applications and miscalculated fees and other charges for thousands of mortgage borrowers,..., resulting in at least $195 million in remediation being paid to affected borrowers…"[3];

   b. "In one such significant technology and internal controls failure, from at least 2011 through April 2018, Respondent's process for evaluating loan modification applications was affected by errors in the relevant calculation formulas. These errors resulted in an overstatement of the attorneys' fees included in the calculation, which sometimes caused an otherwise qualified borrower not to be offered a loan modification.[4];

---

[3] *In the Matter of Wells Fargo Bank, N.A.*, C.F.P.B. Admin. Proceeding File No. 2022-CFPB-0011 (2022), ECF No. 1, ¶ 23, pp. 9-10.
[4] *Id.* at ¶ 24, p. 10.

c. "Respondent became aware of this problem in late 2013 and, after reviewing the issue, concluded that it did not adversely affect borrowers' ability to obtain loan modifications. Respondent attempted to correct the attorneys' fee calculation, but later determined (in March 2018) that it had not fixed the issue and was continuing to fail to offer some borrowers loan modifications."[5];

d. "Another error occurred from July 2013 until September 2018, when Respondent did not offer no-application modifications to approximately 190 borrowers with Government Sponsored Entity (GSE) loans. Respondent erroneously identified these borrowers as deceased and therefore did not assess their eligibility for modifications."[6]; and

e. "Respondent's mortgage servicing operations experienced other errors that resulted in Respondent assessing borrowers unwarranted charges and fees in various situations, including when certain consumers paid off a mortgage that had been subject to a foreclosure judgment; Respondent failed in certain cases to timely pay the appropriate amount of property taxes; Respondent miscalculated the interest rate on certain adjustable rate mortgages after a loan modification ended; and Respondent did not give certain consumers complete information about their ability to stop paying for expensive private mortgage insurance."[7]

91.    On same day as entering the Consent Order, Charlie Scharf, Wells Fargo's Chief Executive Officer, stated publicly that "Our top priority is to continue to build risk and control

---

[5] *Id.* at ¶ 25, p. 10.
[6] *Id.* at ¶ 26, pp. 10-11.
[7] *Id.* at ¶ 27, p. 11

infrastructure that reflects the size and complexity of Wells Fargo and run the company in a more controlled, disciplined way"[8] and "We remain committed to doing the right thing for our customers…"[9]

92.     Wells Fargo's newfound commitment to doing the right thing for its customers appears to be short-lived however because beginning in early December 2023, Wells Fargo began sending the Plaintiff and putative class members form letters which state, in part, "During a review of the account, we identified that when the loan was considered for payment assistance options, an error may have occurred. As a result, we are enclosing a check for $200.00." (the "Apology Letters").

93.     Although the Apology Letters reference a "review of the account", the Consent Order, the *Hernandez* settlement, the *Ryder* settlement, and affirmative statements made in its 10-K's referenced *supra*, demonstrate that Wells Fargo has known about the calculation errors since at least August 2013.

94.     In short, Defendant's Apology Letters, much like the ones sent in the fall of 2018, admit that (a) its accounting error caused consumers to be wrongfully denied a loan modification, admit that (b) its accounting error caused consumers harm, (c) its accounting error resulted in inaccurate negative reporting to consumer reporting agencies that should be corrected, and (d) Defendant had done nothing before September 2018 to remediate consumers and correct inaccurate credit reporting.

---

[8] https://newsroom.wf.com/English/news-releases/news-release-details/2022/Wells-Fargo-Enters-into-Agreement-with-CFPB-to-Resolve-Multiple-Issues/default.aspx (last visited Mar. 1, 2024)
[9] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PLAINTIFF SAMUEL BELOFF'S FACTUAL ALLEGATIONS**

95.     On or about July 15, 1998 Plaintiff Beloff entered into a mortgage related to the Beloff Property.

96.     In 2012 shortly after his wife lost her job Plaintiff Beloff began reaching out to Defendant for mortgage assistance.

97.     Shortly after these calls Plaintiff Beloff began submitting applications for assistance, which to Plaintiff Beloff's knowledge at the time were never processed or resulted in a loan modification being offered.

98.     On September 24, 2015 the Defendant initiated foreclosure proceedings against Plaintiff Beloff and the Beloff Property in *Wells Fargo Bank, N.A. v. Samuel Beloff, et al.*, Greene County (OH) Court of Common Pleas Case No. 2015 CV 0635. (the "Beloff Foreclosure").

99.     After receiving the foreclosure complaint, Plaintiff Beloff was forced to retain counsel who worked with Defendant's foreclosure counsel and negotiated a deed in lieu which transferred the Beloff Property back to the Defendant on or about June 9, 2016.

100.     Almost six and a half years later Defendant sent Plaintiff Beloff a form Apology Letter in December 2023. The form Apology Letter inaccurately states that Defendant just now realized that it committed an error and that Defendant "apologize for any inconvenience this caused".

101.     This was the first time Plaintiff Beloff learned that the Defendant had committed a calculation error and that his modification request should have been approved.  Never in the years since losing the property did the Defendant attempt to discuss with Plaintiff Beloff the calculation error(s) or its wrongful failure to provide mortgage assistance.

102.    Along with the Apology Letter, Defendant enclosed a check for $200.00.  This payment is insufficient to compensate him for the harm he suffered as a result of Defendant's wrongful practices.

103.    Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Beloff was eligible by Defendant's own admissions in the Consent Order), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of his home caused Plaintiff Beloff significant economic and non-economic damages.

## **CLASS ALLEGATIONS**

104.    **The Class:** Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(3) and (b)(1), on behalf of similarly situated individuals and entities ("the Class") defined as follows:

> All persons, as identified by Defendant constituting mortgagors and for which Defendant was the mortgagee and servicer, in the United States who between 2009 and 2020 (i) qualified for a home loan modification, (ii) were denied a permanent loan modification by Defendant due to a calculation error in Defendant's loan modification decision process, and (iii) received the December 2023 apology letter.

105.    Excluded from the Class (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

106.    Plaintiff hereby reserves the rights to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

107. **Numerosity.** The members of the Class are so numerous that joinder of all members is impractical as the Class are estimated, based upon the Hernandez case and Ryder case to consist of hundreds, if not thousands of borrowers. Class members can easily be identified through Defendant's records, or by other means. A class action is the only feasible method of adjudicating the rights of all affected debtors, and absent allowance of a certification of a class action, a failure of justice will result. The number of putative Class members can be readily ascertained by a review of Defendant's records. Using this information, Class members can be identified and ascertained for the purpose of providing notice and ultimate relief.

108. **Commonality and Predominance**. This action involves common questions of law and fact that predominate over any questions affecting individual Class members. These common questions are appropriate for class certification because the resolution thereof would substantially advance the disposition of this matter and each party's interests herein. These common questions include:

    a. What calculation and related errors occurred in Defendant's mortgage loan modification underwriting tool and/or related software between 2010 and 2018?

    b. What were Defendant's common policies and practices regarding its oversight, inspection, auditing, testing, review, repair, and control of automated loan modification tools and related software between 2010 and 2018?

    c. What were Defendant's common policies and practices regarding the inspection, verification, and reporting of negative information to credit reporting agencies between 2010 and 2018?

d.   What were Defendant's common policies and practices regarding rescinding or correcting negative information that was erroneously reported to credit reporting agencies between 2010 and 2018?

e.   How and when did Defendant discover errors in its automated loan modification tools and related software?

f.   What actions and/or disclosures did Defendant take and/or make each time it discovered errors in its automated loan modification tools and related software?

g.   When was Defendant on notice of the risk of errors in its automated loan modification tools due to inadequate oversight, auditing, and testing compliance mechanisms?

h.   Did Defendant undertake any effort to correct its erroneous reporting to credit reporting agencies prior to September of 2018?

i.   Did Defendant owe contractual obligations to Class members by failing to approve them for loan modifications or repayment plans for which they were qualified pursuant to the requirements of government sponsored enterprises, the FHA, and HAMP?

j.   Did Defendant breach those contractual obligations?

k.   Was Defendant's conduct extreme and outrageous?

l.   Did Defendant intentionally, with substantial certainty, or with reckless indifference cause serious emotional harm to members of the Class?

m.   Did Defendant conceal or misrepresent to members of the Class its automated calculation errors and/or their entitlement to loan modifications?

*CLASS ACTION COMPLAINT*
26

n.  Was any such concealment or misrepresentation material to Class members' loan modification?

o.  Did Defendant conceal or misrepresent material facts with knowledge of the fact's materiality and falsity and/or with such utter disregard and recklessness as to infer knowledge of its falsity?

p.  Was the Class members' property in active foreclosure at the time of the calculation error?

q.  Was the mortgage held by Wells Fargo paid in full by the Class member following an application for modification being denied due to the calculation error?

r.  Was the mortgage held by Wells Fargo service transferred and then had foreclosure initiated against the Class member within twelve months of the service transfer following an application for modification being denied due to the calculation error?

s.  Was the mortgage held by Wells Fargo satisfied via short sale proceeds from the Class member following an application for modification being denied due to the calculation error?

t.  Was the Class members' mortgage subsequently modified by Wells Fargo following an application for modification being denied due to the calculation error?

u.  Whether Plaintiff and Class members were injured and suffered damages or other losses because of Defendant's actions as described herein; and

v.    Whether Plaintiff and Class members are entitled to damages, and the measure and amount of those damages.

109.    **Typicality**.  Each of the Plaintiff's claims is typical of those of other Class and Subclass members.  Plaintiff owned residential real property with a residential mortgage loan that was owned and/or serviced by Wells Fargo between 2010 and 2018. The Plaintiff's loan entered loss mitigation review between 2010 and 2018.  The Plaintiff's loans qualified for a mortgage loan modification trial period repayment plan between 2010 and 2018. The Plaintiff completed the trial period repayment plan between 2010 and 2018.  Defendant improperly denied Plaintiff's loss mitigation review for a permanent loan modification between 2010 and 2018 due to automated calculation and related errors pertaining to Defendant's use of a mortgage loan modification and underwriting tool. The Plaintiff received the December 2023 apology letter from Defendant.  As such Plaintiff's claims arise from the same factual circumstances as the claims of other Class members, his damages and injuries are akin to those of other Class members, and Plaintiff is seeking relief consistent with the relief sought by the Class.

110.    **Adequacy**. The Plaintiff is an adequate representative as he is a member of the Class that he seeks to represent, is committed to pursuing this matter against Defendant to obtain relief for the Class, and has no conflicts of interest with the Class. Moreover, Plaintiff's attorneys are competent and experienced in litigating class actions such as this one. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect Class members' interests.

111.    **Superiority**.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff

may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively modest compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

**TOLLING ALLEGATIONS FOR ALL CLAIMS**

112.    The causes of actions alleged herein by Plaintiff against Defendant did not accrue or were tolled until Plaintiff discovered, or could have discovered with the exercise of reasonable diligence, the facts giving rise to their legal claims. Based upon the allegations contained herein the earliest the Plaintiff could have learned of his claims was December 5, 2023.

113.    Based upon the allegations contained herein, Plaintiff had no realistic possibility, until receiving the Apology Letters, to know that (a) he qualified for a loan modification and (b) he was wrongfully denied for a mortgage modification based on a miscalculation done by Defendant's automated decision-making tool that was exclusively under the control of Defendant at all times (as it remains).

114.    Based upon the allegations contained herein Plaintiff had no realistic ability to discover any facts only known to Defendant regarding the wrongful denial for the mortgage modifications submitted between 2010 and 2018. Defendant's automated decision-making tool is not public, and the mathematical calculations used to determine eligibility for any mortgage

modification depend solely on variables within Defendant's exclusive control or information provided exclusively to Defendant.

115.    Based on the foregoing, any applicable statutes of limitations are also tolled by Defendant's knowing, active, and ongoing concealment of the facts alleged herein. Defendant discovered at least one, if not multiple, software errors back in August 2013 which contributed to the wrongful denial of loan modifications of the Plaintiff and all borrowers similarly situated. Based on the allegations contained herein and each 10-Q issued by Wells Fargo & Company since August 2018, Defendant deliberately concealed any information regarding the wrongful denials until September 13, 2018. Defendant has a continuous duty to disclose the truth to Plaintiff and, based upon the actions herein, Plaintiff reasonably relied on Defendant's ongoing concealment until taking the actions to procure discovery described herein.

## CAUSES OF ACTION

### COUNT ONE:
### BREACH OF CONTRACT
**(Brought on behalf of the Plaintiff and Class)**

116.    Plaintiff incorporates by reference all prior allegations of this Complaint as if fully restated herein.

117.    When Plaintiff and putative class members financed their homes, they entered into Security Instruments (typically referred to as either a mortgage, deed or trust or security deed) that set forth the conditions under which the lender could accelerate the borrower's payments and foreclosure on the property.

118.    Wells Fargo was subject to the terms of these Security Instruments, either as the original lender, an assignee, and/or as the mortgage servicer authorized to act on behalf of the lender.

119.    A reasonable interpretation of the Security Instruments required Wells Fargo to provide Plaintiff and Class members all available options to cure a default at the time of default existed under the terms of the Security Instrument.

120.    Based on the allegations *supra*, Plaintiff and each member of the Class provided documents, information, and certifications in compliance with the Security Instruments for Defendant to review for their eligibility for loan modification.

121.    As a result of receiving these documents from Plaintiff and Class members, Wells Fargo was required under the terms of the Security Instruments to consider the Plaintiff and Class members for a loan modification and to provide that loan modification if appropriate.

122.    Based on the allegations *supra*, Defendant reviewed the Plaintiff and Class members for a loan modification.

123.    Based on the allegations *supra*, following the review for a loan modification, Defendant denied the applications for loan modification based upon faulty automated calculations in determining the Trial Plan Payments and/or permanent loan modification payments.  By Defendant's own admissions in the Consent Order and the Apology Letters had the automated calculation(s) been correct, Plaintiff and each of the putative Class members would have been approved for a modification.  Wells Fargo breached its obligations to Plaintiff and putative Class members under the Security Instruments.

124.    Defendant's breach impacted Plaintiff and Class members at a time when they were experiencing extreme hardship. As a result of the faulty automated calculation, Defendant incorrectly provided negative credit information to consumer reporting agencies. Plaintiff and Class members were not offered trial modifications and/or were offered less beneficial modification plans. Ultimately, Plaintiff and Class members were damaged by Defendant's breach.

125.    Defendant also breached its duties under the Security Instruments by failing to give Plaintiff and Class members adequate notice of the mortgage modification.

126.    Defendant discovered its "first" automated calculation error on or before October 2, 2015. While Defendant states that it fixed the first automated calculation error on October 2, 2015, it failed to disclose the error to the public until August 3, 2018, and failed to disclose the error to individuals it affected until September 2018. Despite admitting its error and that its error caused Plaintiff and Class members to suffer significant harm, Defendant did nothing for almost three years to mitigate the harm it caused to Plaintiff and Class members, keeping the accounting error a secret. On information and belief, Defendant continued to fail to offer modification plans to Plaintiff and Class members after discovering its automated calculation error. Defendant breached the duty of good faith and fair dealing it owed to Plaintiff and Class members.

127.    Defendant discovered its "second" automated calculation error on or before April 30, 2018. While Defendant states that it "implemented new controls" on April 30, 2018, it failed to disclose the error to the public until November 6, 2018. Despite admitting its error and that its error caused Plaintiff and members of the Class to suffer significant harm, Defendant has done nothing to mitigate the harm it caused to Plaintiff and Class members. Defendant breached the duty of good faith and fair dealing it owed to Plaintiff and Class members.

128.    Plaintiff and members of the Class were injured by Defendant's breach of the Security Instruments and suffered damages. In sending Apology Letters to Plaintiff and Class members, Defendant admitted the breach; the only question that remains, therefore, is the amount of damages, which is to be proven at trial.

**COUNT TWO**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Brought on behalf of the Plaintiff and the Class)**

129.    Plaintiff incorporates by reference all prior allegations of this Complaint as if fully restated herein.

130.    As alleged in this complaint, Defendant engaged in extreme and outrageous conduct. It repeatedly failed to oversee, audit, and test its servicing, modification, and foreclosure practices, including its automated calculation software. It then used that automated calculation software to make automated decisions about offering modifications and whether or not its customers could keep their family homes. As a result of repeated federal investigations, fines, and consent cease and desist orders, Defendant was on notice of its own deficient, unsafe, and unsound practices. Yet it allowed material errors in its software to persist for years, affecting hundreds of borrowers and causing the unnecessary foreclosure of hundreds of homes.

131.    And despite discovering its 2010-2015 automated calculation error no later than 2015, Defendant concealed its errors from government regulators and the public until 2018, when it was subjected to yet another consent cease and desist order. As the Federal Reserve determined, Defendant prioritized profits and growth over compliance.

132.    As a result of Defendant's long-term actions and inactions, Plaintiff and Class members suffered severe emotional distress. Thus, contemporaneously with Defendant receiving billions of dollars in HAMP funds from the U.S. Government, Defendant systematically injured Plaintiff and Class members through modification denials stemming from Defendant's reckless and heartless cover ups and known and yet unmitigated errors.

133.    Defendant knew or should have known that by denying Plaintiff and Class members a loan modification, its conduct would result in serious emotional distress to Plaintiff and the other Class members, as the loss or potential loss of a home is an emotionally significant event.

134.    Defendant's reckless disregard for such emotional distress was beyond all possible bounds of decency and completely intolerable in a civilized community.

135.    The U.S. Government's creation of HAMP and other loan modification programs show that it intended for no person in a situation similar to Plaintiff and Class members to have to endure what Defendant forced Plaintiff and Class members to endure.

136.    Defendant's conduct was intentional and evidences a callous and reckless disregard for the rights of its customers and for the risk its actions posed to its customers.

137.    Defendant's intentional extreme and outrageous conduct proximately caused Plaintiff and Class members to suffer emotional distress and damages, in an amount to be proven at trial.

## COUNT THREE
### NEGLIGENCE
### (Brought on behalf of the Plaintiff and Class)

138.    Plaintiff incorporates by reference all prior allegations of this Complaint as if fully restated herein.

139.    Defendant had an obligation to ensure that the information and statements it reported to credit reporting agencies were true and accurate. Defendant had a duty to Plaintiff and Class members to report fair, honest, and accurate information to the credit reporting agencies.

140.    Defendant made statements to the credit reporting agencies regarding the Plaintiff and Class members that were derogatory to their credit. The negative and derogatory information

reported by Defendant to the credit reporting agencies was that the Plaintiff and Class members had experienced a foreclosure or other negative event related to their mortgages.

141.    When Defendant made these negative and derogatory statements about Plaintiff and Class members, it knew or should have known that the statements were false and/or inaccurate, based upon Defendant's own miscalculations.

142.    The reporting of a negative event related to a mortgage has a serious detrimental effect on credit. The reporting of a foreclosure is taken as an indication of poor creditworthiness. The reporting of a foreclosure or other negative event related to a mortgage reduces one's credit score between 85 to as much as 160 points.

143.    Defendant's reporting of a negative event related to a mortgage against the Plaintiff and Class members had a serious and detrimental effect upon their credit and creditworthiness. Defendant's reporting of a negative event related to a mortgage against Plaintiff and Class members reduced their credit scores substantially.

144.    The effect of Defendant's reporting of a negative event related to a mortgage against the Plaintiff and members of the Class was not transitory. Upon information and belief, certain negative events related to a mortgage remain on a consumer's credit report for seven years. Defendant's reporting of a negative event related to a mortgage against the Plaintiff and the members of the Class therefore resulted in long-term damage to their credit, creditworthiness, and credit scores.

145.    Defendant's reporting of a negative event related to a mortgage regarding Plaintiff and Class members was untrue or, in the least, requiring additional information so as to make the reporting of a negative event related to a mortgage not misleading. The communication of a

negative event related to a mortgage created a false impression that would be contradicted by the inclusion of omitted facts.

146.     Defendant concedes that the negative event related to a mortgage was not correct and that, at the least, Plaintiff and Class members should have been approved for a trial modification that could have avoided a negative event related to a mortgage. Therefore, the reporting of a negative event related to a mortgage was false or at least gave a misleading impression that would have been contradicted by including the omitted facts of the circumstances of the negative event related to a mortgage.

147.     Defendant wrote to Plaintiff and Class members as follows, showing the untrue and misleading nature of the reporting of a negative event related to a mortgage: "We have some difficult news to share. When you were considered for a loan modification, you weren't approved, and now we realize that you should have been." As set forth herein, Defendant admits it erred.

148.     Defendant's reporting of a negative event related to a mortgage was reckless, or at least negligent, at the time that it was made and, upon information and belief, the reporting of a negative event related to a mortgage was knowingly false not later than 2013. Yet, Defendant failed to take any action to correct its false statements and allowed reports of a negative event related to a mortgage that it knew to be false to tarnish the credit of Plaintiff and Class members for years.

149.     Upon information and belief, Defendant knew or should have known that there were flaws in its mortgage modification application software as early as 2011 and before the time it foreclosed upon or initiated other negative events related to a mortgage on the homes of Plaintiff and Class members. Defendant thereby acted recklessly and maliciously.

150.     As set forth herein, the OCC and the Board of Governors of the Federal Reserve warned Defendant and its parent company in 2011 that, inter alia, the Bank was engaged in "unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings." The Comptroller advised the Bank that it had failed to devote sufficient resources to the administration of its foreclosure processes, failed to perform adequate oversight, risk management, and audit of those processes, and failed to adequately oversee third-party vendors. The Comptroller, furthermore, specifically required the implementation of "processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the underlying mortgage note" and applicable legal requirements. Therefore, by the time of the negative event related to a mortgage of the homes of Plaintiff and Class members, Defendant was on notice to correct deficiencies with respect to the calculation of fees charged to borrowers and its failure to do so was reckless and therefore malicious.

151.     Furthermore, upon information and belief, Defendant knew that there were flaws in its mortgage modification application software as early as 2013, which specifically resulted in the sort of erroneous denials of modifications at issue in this case. As set forth herein, Defendant's internal documents show that the software error resulting in the claims in this case was reported to Defendant and known within the organization no later than 2013. Upon information and belief, Defendant therefore knew or should have known that it had wrongly denied applications for mortgage modifications by that time.

152.     Once Defendant knew or should have known that it had wrongly denied applications for mortgage modifications, Defendant's report of the Plaintiff's and Class members' negative events related to a mortgage to credit reporting agencies was not only recklessly untrue, but willfully so. At that point, Defendant was required to disclose information or to make

corrective statements in order to make the previous statements that Plaintiff and Class members had been subject to negative events related to a mortgage not misleading.

153.    Therefore, Defendant's statements to credit reporting agencies with respect to the negative event related to a mortgage of Plaintiff and Class members were both recklessly malicious at the time they were made, and willfully malicious once Defendant knew or should have known that it had wrongly denied applications for mortgage modifications. Defendant's report that Plaintiff and Class members had experienced negative events related to a mortgage was thus a communication made with malicious and/or willful intent not subject to preemption by the Fair Credit Reporting Act.

154.    Further, Defendant willfully, or at least recklessly, failed to correct its statements regarding Plaintiff and Class members, and to correct the wrong information that it had provided to the credit reporting agencies. It did this with the knowledge of the serious impacts this inaction would have on Plaintiff and Class members.

155.    Plaintiff and Class members were left to deal with a negative event related to a mortgage on their credit report, that they would have to explain to future mortgage lenders for the rest of their lives, because they were not offered a mortgage modification due to Defendant's misconduct, which is a serious derogatory credit item which caused Plaintiff and Class members damage.

156.    As a result of Defendant's statements affecting their credit, Plaintiff and Class members suffered damages in an amount subject to proof, including loss of time and money spent in efforts to repair their credit; loss of favorable interest rates or other favorable loan terms; damage to credit; and opportunity costs due to damaged credit or higher costs of borrowing.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant Wells Fargo Bank, N.A. as

follows:

        A. For an Order Certifying the Class, appointing Plaintiff as Representatives

of the Class and Plaintiff's counsel as Class Counsel;

        B. For entry of judgment in favor of Plaintiff and members of the Class against

Defendant for damages in an amount to be proven at trial, including statutory, treble

and/or punitive damages in accordance with applicable law.

        C. For entry of judgment in favor of Plaintiff and members of the Class against

Defendant for reasonable attorneys' fees and costs.

        D. For entry of judgment in favor of Plaintiff and members of the Class for

pre-judgment interest on all damages; and

        E. For such other and further relief as the Court deems just and equitable.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Dated: March 12, 2024        Plaintiff SAMUEL BELOFF individually and on
                        behalf of all others similarly situated,

                        By: /s/ Mark L. Javitch
                            Mark Javitch (CA SBN 323729)
                            Javitch Law Office
                            3 East 3rd Ave. Ste. 200
                            San Mateo, CA 94401
                            Telephone: (650) 781-8000
                            Fax: (650) 645-0705
                            mark@javitchlawoffice.com

                        *Attorneys for Plaintiff and the Putative Class*